15203

COOK v. ATLANTIC COAST LINE R. CO. *ET AL.*

(13 S. E. (2d), 1)

232

*Messrs. Charlton DuRant* and *Woods & Woods,* for appellants,

*Mr. John G. Dinkins,* for respondent,

January 15, 1941.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE FISHBURNE.

The wife of the plaintiff was one of eight persons—all women, including the driver—riding in an automobile which was in collision with one of defendant's freight trains on June 25, 1937, at a railroad crossing in the unincorporated Town of Cades. As a result of the collision the plaintiff's

wife, who rode in the back seat, received grave and permanent injuries, which, it is alleged, were caused by the negligence of the railroad company and its engineer and co-defendant, B. S. Artopee. The plaintiff instituted this action for the recovery of consequential damages for the loss of his wife's society, companionship, and services; and for damages for the loss of his wife's society, companionship, and services; and for damages suffered by reason of having to pay out considerable sums of money for hospital expense and medical attendance. At the time of the accident Mrs. Cook was fifty years of age, was in good health, and was the mother of six children. The trial resulted in a verdict against the defendants in the sum of $10,000.00.

This Court is asked to reverse the judgment in this case on the ground that the plaintiff's wife and the driver of the car, Mrs. Bryan Cook, were guilty of such contributory negligence that the Court below should have directed a verdict. It will aid in the decision of the case to state the following facts:

All of the occupants of the automobile lived within a radius of seven miles of Cades, and were more or less familiar with the railroad crossing where the accident occurred. having used this crossing from time to time. At the crossing the railroad consisted of three tracks running north and south. The Hebron-Cades public highway which intersected it at right angles, runs east and west. The ladies had attended a religious meeting at Cades, and were returning to their several homes about 5:30 o'clock in the afternoon, in an automobile driven by Mrs. Bryan Cook. They traveled upon a road which was adjacent to and parallel with the railroad, which was on their left as they proceeded to the crossing. On reaching the crossing the driver stopped the car to await the passing of a freight train running south.

The automobile at the point where it was stopped, was turned at a slight angle to the left, and had just entered the Hebron-Cades highway. When the freight train, which was more than three-quarters of a mile long, had passed, the

driver of the automobile, the plaintiff's wife, and some of the other occupants of the car, according to their testimony, looked and listened to ascertain whether or not another train was approaching. They looked in both directions, north and south, but neither saw nor heard any other train. The driver thereupon proceeded upon the crossing. Just as the automobile got upon the first railroad track, one of its occupants saw a north-bound freight train to their left, which was practically upon them. The driver increased her speed, but did not escape the impending collision. The train hit the rear end of the automobile, resulting in permanent injury to plaintiff's wife.

The parallel road traveled by the automobile while approaching the crossing was about three feet below the level of the railroad track which ran to its left, until a point was reached about forty feet from the crossing, where it ascended to the track level. There was testimony from many witnesses that the defendants failed to give the statutory crossing signals. The testimony also showed that there was considerable dust and smoke at the crossing left by the south-bound freight train which had just passed. The plaintiff claims, too, that the north-bound freight train which collided with the automobile and which approached from its left, could not be seen from the place where the car was stopped because of certain obstructions on the right-of-way. On this point considerable testimony was taken, and two diagrams and certain photographs were introduced in evidence showing the location and extent of the obstructions.

A witness for the plaintiff, a Mr. Floyd, an experienced surveyor and engineer, made a map of the locus, and testified in detail to the presence and location of the obstructions. He and another witness said that for a distance of 878 feet from the crossing looking toward the south, the view was open, but that from that point on a train could not be seen. He testified that the first obstruction to meet the eye of one at the crossing looking to the south, was a block signal which consisted of a concrete base twelve inches or

more in width and five feet high, which supported a six-inch staff. This was 278 feet to the south of the crossing. At a point 795 feet south of the crossing there was a mail crane, at the base of which were four posts, so arranged as to constitute successive steps to reach the top of the crane, and these posts were 8x8 inches in size. A pump house eighty-three feet farther to the south constituted the first main obstruction. It presented a blank wall 8x8 feet, about 10 feet high, the gable ends being parallel with the track. Beyond the pump house was located a water tank, 1,532 feet to the south of the crossing, which was supported by six substantial wooden pillars. Between the pump house and the water tank were five electric light poles of the usual size. All of these alleged obstructions were about ten feet away from the railroad track, and between the track and the parallel road along which the automobile had traveled. It is undisputed that there was a slight curve in the track between the pump house and the crossing.

The witness, Floyd, testified that he placed himself at the crossing in the same position occupied by the automobile before it attempted to cross the railroad, and looked back and to his left, and that his line of vision was obstructed by the mail crane, the pump house, the telephone poles, and the water tank. That looking to the south from where the car was stopped at the crossing, these obstructions "lined up," and from the pump house on presented practically a solid wall. As stated, another witness testified to the same effect, having demonstrated this by sitting in an automobile in the driver's seat at the point where Mrs. Cook stopped her car.

Testimony for the defendants tended to show that the obstructions referred to were minor, and would not blot out the view of a train coming from the south. According to some of the witnesses, the speed of the train was about thirty-five miles per hour. There was also testimony which permitted the inference that the train was running at a speed of about fifty-five miles per hour. If it had been running at

the latter rate of speed it would have traveled the distance from the pump house to the crossing in about eleven or twelve seconds.

The defendants urge that the failure of the driver of the automobile, Mrs. Bryan Cook, to see the approaching train in time to avoid a collision, was wholly and plainly without justification, and was due to such gross, willful and reckless negligence on her part as to defeat any right to recover damages for any injury. It is argued that the plaintiff's wife would have had no cause of action, and therefore he has none.

It is rare that negligence or contributory negligence is dependent on a single fact. On the contrary, it is to be determined by a consideration of all the relevant surrounding circumstances. One fact, separate from others, may have little or no bearing, and, by the process of elimination, all ground for the contention that negligence exists on the part of the plaintiff or defendant may be removed; when, if all the circumstances are considered together, the inference of negligence is manifest.

As shown by the evidence, when the automobile stopped at the entrance of the Hebron-Cades highway before attempting to cross the first railroad track, the driver and the plaintiff's wife looked and listened, but did not see or hear the north-bound freight train approaching from the south. It will be recalled that the long south-bound freight train which had temporarily blocked the crossing, had just passed, with its attendant dust, smoke, noise and vibration; and as it passed the north-bound train was approaching. The witness for the plaintiff testified, as stated, that from the point where the driver sat in the automobile her view to the south was obstructed by the pump house, and from that point on an approaching train could not be seen.

This being a motion for a directed verdict, it will be assumed, although the testimony is in conflict, that the statutory crossing signals were not given, and

that the railroad company was guilty of negligence *per se* by failing to blow the whistle or ring the bell. Also, in recognition of the familiar rule in considering whether a motion for a directed verdict should have been granted against the plaintiff, testimony and all reasonable inferences to be drawn therefrom must be taken in a light most favorable to the plaintiff.

Under the specific terms of the signal statute, the common-law defense of contributory negligence is eliminated from our consideration. The language of the statute (Section 8377, Code, 1932) is that, if the failure to give the specified signals contributed to the injury, liability for all damages caused by the collision is imposed upon the railroad company, unless, in addition to a mere want of ordinary care, it is shown that gross willful negligence or unlawful act, chargeable to the person injured, contributed to the injury. *Glenn v. Southern R. Co.,* 145 S. C., 41, 142 S. E., 801; *Ford v. Atlantic Coast Line R. Co.,* 169 S. C., 41, 168 S. E., 143; *Nofal v. Atlantic Coast Line R. Co.,* 175 S. C., 94, 178 S. E., 541; *Carter v. Atlantic Coast Line R. Co.,* 192 S. C., 441, 7 S. E. (2d), 163, 168.

The duties imposed upon a traveler when approaching a railroad crossing have been so recently and so fully stated by this Court as to make it unnecessary to do more than merely to refer to the recent cases of *Robison v. Atlantic Coast Line R. Co.,* 179 S. C., 493, 184 S. E., 96; *Hicks v. Atlantic Coast Line R. Co.,* 187 S. C., 301, 197 S. E., 819; *Wannamaker v. Southern R. Co.,* 191 S. C., 86, 3 S. E. (2d), 811; *Howell v. Southern R. Co.,* 192 S. C., 152, 5 S. E. (2d), 860; *Moore v. Atlantic Coast Line R. Co.,* 192 S. C., 406, 7 S. E. (2d), 4; *Smith v. Southern Ry.-Carolina Division,* 193 S. C., 44, 7 S. E. (2d), 630; *Carter v. Atlantic Coast Line R. Co., supra,* 192 S. C., 441, 7 S. E. (2d), 163, 168; *Carter v. Atlantic Coast Line R. Co.,* 194 S. C., 494, 10 S. E. (2d), 17; *Bingham v. Powell,* 195 S. C., 238, 11 S. E. (2d), 275.

In the last-mentioned case of *Carter v. Atlantic Coast Line R. Co.* [194 S. C., 494, 10 S. E. (2d), 20], the applicable rule is thus stated: "A rule firmly established by the foregoing cases is that a traveler on reaching a railroad crossing and before attempting to go upon the track, must use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances; he must look and listen in both directions for approaching trains; if not prevented from so doing by the fault of the railroad company, and to the extent the matter is under his control, he must look and listen at a place and in a manner that will make the use of his senses effective. Another principle which the cases sustain is that the duty of a traveler arising under the foregoing rule is not an absolute one, but may be qualified by attendant circumstances. See *Chisolm v. Seaboard Air Line Ry., supra* [121 S. C., 394, 114 S. E., 500]."

It seems to us that in approaching the railroad and entering upon this group of tracks, the evidence permitted the inference that the driver of the automobile and the plaintiff's wife exercised as much diligence as an ordinarily prudent person would have exercised under the circumstances, having regard for their own safety and fairly endeavoring to perform their duty. The omission to give the statutory crossing signals was not only negligence *per se* and a violation of a statutory duty on the part of the defendants, but it also bears upon the conduct of the plaintiff's wife and the driver, and must affect any estimate of the amount of care they should have observed.

Of course the failure to give the statutory signals does not relieve a traveler of his duty to look and listen before going upon a railroad crossing. But this rule is not arbitrary as to the time and the distance at which such precaution shall be taken. Ordinarily such questions are for the jury. It may be inferred from the evidence that the driver of the car stopped her automobile nine or ten feet

from the crossing, and that it was at this point that its occupants looked and listened.

Can it be said as a matter of law under the circumstances narrated that the driver, or the plaintiff's wife, was bound to have seen the north-bound freight train which collided with them? The rule is that a traveler is not bound to see or to hear, but is bound to make all reasonable effort to see and to hear that an ordinarily prudent man would make under like circumstances. The configuration of the tracks, the failure to give the statutory signals, the presence of dust and smoke, the noise and vibration of the receding south-bound freight train, and the presence of the obstructions referred to might well have disturbed the judgment of the driver of the car, even though they did not actually confuse her. Whether under the circumstances which confronted and surrounded her she was guilty of gross or willful negligence was a question that a jury alone could determine. We cannot say as a matter of law that the driver or the plaintiff's wife was guilty of negligence or contributory negligence amounting to willfulness or wantonness. Whether under the circumstances they did or could have seen or heard the train was an issue, upon all the facts and the reasonable inferences to be drawn therefrom, for the jury. In our opinion the motion for a directed verdict was properly overruled.

A very interesting and important question raised by the appeal challenges the right of a husband to maintain an action for the loss of *consortium,* growing out of an injury to the wife caused by the negligence of another. The Circuit Judge refused requested instructions that the plaintiff could not maintain this action, but on the contrary charged the jury that an action existed in favor of the husband for the loss of the services, society, and companionship of his wife. It is argued in the able brief of the appellants that modern legislation has greatly affected the status of married women by recognizing their right to a separate existence, entitling them to the ownership and

control of their property, giving them ability to contract, power to control their earnings, and endowing them with the capacity to sue and be sued.

In *Bryant v. Smith,* 187 S. C., 453, 198 S. E., 20, we had occasion to review at length the changes which have been wrought in the legal status of married women by comparatively recent legislation in this State, culminating in Section 400 of the Code, and to note the marked character of the results which must attend them. In this connection we observed that this legislation had removed the foundation of the unity in the husband of his own and his wife's legal identity insofar as it affected property rights, contracts, earnings, and the right to sue and be sued. The case had to do with the liability of the husband for the tort of the wife. However, the question now before us was not at issue, and of course was not determined.

Whether this legislation has abridged in any wise the common-law right of a husband to the companionship, aid, society, and services of his wife—which is comprehended by the term *"consortium"*—and his attendant right to sue therefor in the event of their loss through some personal injury to her, is a question upon which the cases are not agreed.

The great weight of authority supports the proposition that the common-law right of the husband is not destroyed by these statutes—that he may still recover for loss of *consortium* of which he is deprived by a negligent injury to the wife. 27 Am. Jur., Section 502, page 101, and see cases cited; Annotation, 21 A. L. R., 1517; Annotation, Ann. Cas., 1912-B, 1125; Restatement. of the Law, 3 Torts, § 693, page 492.

In our opinion, after reviewing a multitude of cases, the husband's right to the wife's services, aid, comfort, society and companionship remain despite the so-called Married Women's Acts. He is still under duty to support her, and is entitled to the services which she may choose to perform and customarily does perform, and this right of action re-

mains in him, even though a married woman is entitled to her own property, may contract, may sue and be sued as *femme sole;* and although she may recover in her own name her own earnings.

The reasoning underlying the authorities to which we have referred is well illustrated by what the Court said in *Denver Consol. Tramway Co. v. Riley,* 1899, 14 Colo. App., 132, 59 P., 476, 479: "The companionship and society of a wife are not articles of commerce. They cannot be weighed or measured. They are not bought and sold, and no expert is competent to testify to their value. The consideration upon which they are bestowed is not pecuniary. Yet the husband is entitled to compensation in money for their loss, and the amount of that compensation is to be determined by the jury, not from evidence of value, but from their own observation, experience, and knowledge, conscientiously applied to the facts and circumstances of the case. So, also, in relation to the services of the wife. The wife does not occupy the position of a servant, and her services to her husband are not those of a servant. She makes his home cheerful and inviting, and ministers to his happiness in a multitude of ways outside of the drudgery of household labor. All the work of the house may be done by hired employees, and her services still give character to the home. They are not rendered in accordance with set rules. They are not repeated in regular order from day to day. They have their source in the thoughtfulness of the wife, and her regard for her husband; and no witness is qualified to define them, or reduce them to a list, or say what they are worth. So that their value must also be estimated by the jury."

Cases may be found to the contrary. For example, *Marri v. Stamford St. R. Co.,* 84 Conn., 9, 78 A., 582, 33 L. R. A. (N. S.), 1042, Ann. Cas., 1912-B, 1120. But we think the doctrine announced in this and in similar cases representing the minority view, is unsound.

It follows under the majority rule, in which we concur, that the husband is entitled to recover the value of those

services of his wife which he has lost, including the loss of his wife's society and companionship in the home—all of which are comprehended by the term *"consortium."* He is also entitled to recover for any expenses which he has incurred for her care and treatment because of illness or bodily harm suffered by her, and for any medical expenses which he has incurred. See especially *Coulter v. Hermitage Cotton Mills,* 112 S. C., 93, 98 S. E., 846; *Priester v. Southern R. Co.,* 151 S. C., 433, 149 S. E., 226.

Appellants complain that certain remarks and comments of the Circuit Judge during the progress of the trial constitute reversible error. It is not suggested that the Judge had any conscious intention of prejudicing the rights of the defendants, but it is argued that his remarks tended to discredit and belittle the cross examination conducted by the defendants while Mr. Floyd, the surveyor, was on the stand. We do not think so.

In the cross examination of Mr. Floyd by Mr. DuRant, of counsel for the defendants, the witness had been examined in detail with reference to the location of the physical objects on the railroad right-of-way and alongside the east track, which plaintiff contended constituted obstructions. This examination was also exhaustive in eliciting the size and shape of the various obstructions. Immediately preceding the remarks of the Judge, the witness had been under cross examination with reference to the distance of the pump house from the railroad track. He had just stated that it would be necessary for him to refer to his notes, when the trial Judge said: "Well, we will adjourn at this point until tomorrow morning. And bring your notes in the morning. But I am afraid if you put the pump house ten feet from the rail Mr. DuRant will move it to seven."

These remarks were evidently of a more or less jocular nature, and were intended as such. They were not addressed to the jury, although made in the jury's presence. But even so, we are unable to concur in the view that any prejudicial result followed.

Nor do we think there was error in allowing one of plaintiff's witness's to state that no flagman was stationed by the defendant at the crossing. The complaint contains no specific allegation of negligence as to this, and the absence of a flagman was not negligence. The testimony was offered and admitted, not as a fact tending to show negligence on the part of the defendant company in that regard, but merely to show one of the existing circumstances attendant upon the alleged injury. Furthermore, the witness had answered the question before any objection was made. The Judge instructed the jury that they could find a verdict against the defendants or either of them only upon the negligence charged in the specifications set forth in the complaint. The verdict against the engineer, who of course had nothing to do with the absence or presence of a watchman at the crossing, certainly indicates that the allowance of this evidence was not prejudicial, even if error.

In the course of the trial the Court directed a verdict in plaintiff's favor as to the defendants' defense of estoppel by conduct on the part of the plaintiff. The question arose in this way: Prior to the institution of the case at bar plaintiff's wife, in her own name, brought an action for damages against the railroad company on account of personal injuries sustained by her as a result of the railroad crossing accident. The other occupants of the automobile, all of whom received personal injuries, also brought suit. It appears that the plaintiff, as her husband, employed counsel to institute the action for her, and that after negotiations for settlement were had with the railroad company, in which the plaintiff participated as the representative of his wife who was incapacitated, a settlement was had with all the parties, including the plaintiff's wife, resulting in a release. It is now said that the plaintiff is estopped from bringing this action—which is altogether distinct and separate from the action of the wife—because of his conduct in the negotiations leading to the settlement of her case. Much testimony was taken with reference to the

defense of estoppel. The evidence permits the inference that the agreement for settlement included only personal injuries. However, the executed release includes claims for nursing, attention and extra expenses which are also claimed in the case at bar.

We agree with the Circuit Judge that there is no evidence in the record from which a reasonable inference may be drawn which would warrant the finding of estoppel. An examination of the record discloses no act or word of the plaintiff by which the defendants could reasonably have been misled into separately settling the suit formerly brought by the plaintiff's wife for the damages accruing to her on account of her personal injuries. There is nothing to remotely indicate or tending to show that the defendants believed or had any ground for believing that they were making settlement with the plaintiff for another cause of action existing in his favor. The testimony shows without dispute that the plaintiff paid from his own funds all of the hospital and medical expenses and the nursing bills for his wife's care and treatment, which, of course, he was legally bound to pay. There was an absence of testimony tending to show that his wife had contracted or had agreed to pay such items.

Error is assigned to the instruction in relation to the presumption arising out of the failure of the defendants to give the statutory crossing signals. We give that portion of the charge on the subject under criticism: "You are further instructed that when a person is injured as the result of a collision with the engine of a railroad company at a crossing, and the railroad failed to give the statutory signals at such time and place, the presumption arises that the failure to give the signals was the proximate cause of the injury, which presumption, however, can, of course, be overcome by proof that the neglect to give the signals was not the proximate cause of the injury."

The foregoing instruction was immediately followed by this: "I charge you that, and I charge you this: Our Supreme Court has laid down this rule, even if you find that

the defendants should have given the signals required by the statute, and that it should have blown the whistle or rung the bell for the required distance prescribed by statute, and they failed to do that, that in such an event you would not be authorized in finding a verdict against the defendants for negligence resulting from such failure, unless you find that but for such failure to give those signals the injuries complained of would not have occurred."

The appellants' criticism of the charge is that it permitted the presumption as to proximate cause arising from the failure to give signals to be taken as evidence to be weighed against evidence to the contrary introduced by the defendants, and it shifted the burden of proof as to proximate cause from the plaintiff to the defendants and only permitted the defendants to discharge the burden and overcome the presumption by affirmatively proving that the neglect to give the signals was not the proximate cause of the injury; whereas, it is said the true rule, as established by the decisions, is that the presumption is not to be taken as evidence to be weighed against the contrary evidence of the defendants, and it can only serve to cast upon the defendants the duty of producing some evidence to the contrary, whereupon the presumption is at an end, and the question becomes one for the jury upon all of the evidence. We think there is no merit in the exception raising this question, as shown by the cases of *McBride v. Atlantic Coast Line R. Co.,* 140 S. C., 260, 138 S. E., 803, and *Ford v. Atlantic Coast Line R. Co., supra.*

Error is assigned because of this instruction to the jury: "But, says the law, if the person who was injured was only guilty of simple negligence, and the person causing the injury was guilty of gross negligence, wilfulness or recklessness or wantonness, the simple negligence on the part of the one injured would not constitute contributory negligence, such as to bar recovery."

It is argued that while contributory negligence is no defense to an injury willfully, wantonly or recklessly inflicted,

gross negligence is not the equivalent of willfulness, wantonness or recklessness. The case of *Sample v. Gulf Refining Co.,* 183 S. C., 399, 191 S. E., 209, relied upon by appellants, is not applicable. The issue of punitive damages was not submitted to the jury.

In a long and admirably correct charge to the jury, such as was given in the case at bar, the fine distinction pointed out in these exceptions is, in our opinion, hypercritical. To constitute reversible error, not only must the error be shown, but it must also appear that the error was prejudicial. We find this syllabus in *Atlantic Coast Line R. Co. v. Ford,* 287 U. S., 502, 53 S. Ct., 249, 77 L. Ed., 457, affirming *Ford v. Atlantic Coast Line R. Co., supra,* with which we are in accord: "Instructions must be reasonably interpreted and are not generally subject of error on account of not being sufficiently definite if omissions complained of are not at the time pointed out."

While strictly speaking we have no omission here but a rule of law alleged to be incorrect, we think counsel for the appellants might well have brought this matter to the attention of the trial Judge at the conclusion of his instructions when counsel for each side freely exercised the privilege for making suggestions as to matters which had not been fully covered. At any rate, we are satisfied that no prejudicial error resulted to the defendants.

It is alleged that the Court erred in overruling defendants' motion for a new trial upon the ground that the amount of the verdict found by the jury was excessive and without justification or support under the testimony. It is said that the verdict was so grossly excessive as to be unexplainable unless it were the result of caprice, passion or prejudice. The evidence leaves no doubt of the serious and permanent disability suffered by the plaintiff's wife. The doctors who testified described it as a permanent disability amounting to 75%. Nor does the evidence leave any question that she will never again be able to attend to her household and domestic affairs as she for-

merly did. She is now permanently helpless, as shown by the evidence, and will remain so, having to be waited upon and cared for. At the time of the trial the plaintiff testified to having paid out over $850.00 covering the expenses incurred. While the verdict is full, we are not in position to say that the trial Judge abused his discretion in refusing the motion for a new trial on this ground.

It is said that the Court erred in telling the jury when taking a recess for lunch: "You must not, under any circumstances, talk about this case to anybody. You can talk among yourselves, because you are the jury, but do not let anyone else discuss this case with you * * *." It is said that the defendant suffered prejudice because when the recess was taken a stage of the trial had been reached when only the testimony for the plaintiff had been given, and therefore that only testimony adverse to the defendants was before the jury which could constitute matter for their discussion among themselves. There is no merit in this contention.

Finally, error is charged because the Judge allowed the mortuary tables in evidence. This evidence was admitted solely for the purpose of tending to show the life expectancy of the plaintiff's wife, and for this purpose it was competent. *Long v. Carolina Baking Co.*, 193 S. C., 225, 8 S. E. (2d), 326. The jury was under the duty to assess the damages suffered and to be suffered by the plaintiff, for the loss of the services and companionship of his wife, so it was relevant to show the normal expectancy of life of Mrs. Cook.

All exceptions are overruled.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES CARTER and BAKER concur.

MR. JUSTICE STUKES did not participate in the consideration or decision of this case.