18225

Helen Jones WINGATE, Admx. of the Estate of John Goodman
Wingate, Respondent, v. SEABOARD AIR LINE RAILROAD
COMPANY, Appellant.

(137 S. E. (2d) 258)

*Messrs. Grier, McDonald, Todd, Burns & Bradford,* of
Greenwood, and *John Spratt,* of York, *for Appellant,*

*Charles B. Ridley, Esq.,* of Rock Hill, *for Respondent,*

June 11, 1964.

Lewis, Justice.

Plaintiff's intestate, John Goodman Wingate, was instantly killed on November 25, 1960, about 10:30 A. M., when his automobile was struck by a train of the defendant, Seaboard Air Line Railroad Company, as he was proceeding across the defendant's tracks at a crossing near Edgemoor, South Carolina, where the main line and a side track of the defendant are intersected by an unimproved county road. Separate actions were instituted by the administratrix of the estate of the deceased against the defendant to recover for the intestate's alleged wrongful death and for the destruction of his automobile. The actions involved the same facts and were tried together, resulting in a verdict against the defendant for actual damages in each. This is a consolidated appeal by the defendant from the adverse judgment in each action, presenting the single question of whether the deceased was guilty of contributory gross or wilful negligence as a matter of law, so as to bar the administratrix of his estate from recovery.

The complaint alleges that the collision and resulting damage were caused by the negligence, recklessness and willfulness of the defendant and its employees in operating the train at an excessive rate of speed, in failing to maintain a proper lookout, in failing to give the statutory crossing signals, in failing to properly maintain the crossing so that those traveling over it would be provided with a safe and easy passage over the rails, in so maintaining the crossing that the view of a traveler was obstructed by an embankment, trees and high grass, in failing to erect and maintain at the crossing adequate warning signs, and in failing to apply the brakes on the train to avoid the collision. The defendant's answer contained a denial of these allegations and interposed the affirmative defense of contributory negligence, recklessness and willfulness on the part of plaintiff's intestate. During the trial of the case, the defendant made timely motions for a nonsuit and directed verdict upon the ground that plaintiff's intestate was guilty of contributory gross or willful negligence as a matter of law in that the

evidence admits only of the reasonable inference that he approached and entered upon the crossing immediately in front of an oncoming train without taking due or even slight care for his own safety. These motions were refused by the trial judge and the correctness of his ruling is the sole issue presented in this appeal.

On the morning in question, the deceased was proceeding in a westerly direction along a dirt public road which crosses the tracks of the defendant about one and one-half miles north of the small town of Edgemoor, South Carolina. The railroad runs in a general north-south direction. The public road is described as forming an "S" curve as it approaches the crossing from the direction in which the deceased was traveling. From that direction, the first curve in the "S" turns to the traveller's left and the last to his right as he immediately approaches the crossing. One would come out of the first curve approximately 325 feet from the crossing and travel about 225 feet nearly parallel to the railroad tracks before entering the last curve to the right. As a traveller comes out of the last curve, the road is straight for a distance of approximately 60 feet to the defendant's main line where the collision took place, and intersects the tracks at a very slight angle.

The defendant maintained two tracks over the crossing, one its main line and the other a passing track. From the direction in which the deceased approached, one would first cross the passing track and then the main line. At the time of the collision, there was in place the statutory railroad cross arm sign. The testimony is uncontradicted that the deceased approached the crossing at a very slow speed, estimated at from 5 to 15 miles per hour, and that the train approached at approximately its scheduled speed of seventy miles per hour. The automobile of the deceased was struck on the right side near the rear fender.

In so far as this appeal is concerned, it is conceded that the statutory signals were not given by the employees of the defendant as required by Section 58-743 of the 1962

Code of Laws; and that, in order to require reversal of the judgment herein, it must appear from the evidence that the deceased was guilty of contributory "gross or willful negligence" as a matter of law, Section 58-1004 of the 1962 Code of Laws.

While the railroad is required to give the statutory crossing signals, the failure of the railroad to give such signals does not relieve a traveler of the duty to exercise due care to observe the approach of trains at the crossing. As stated in *Robinson v. Atlantic Coast Line Railway Co., et al.,* 179 S. C. 493, 184 S. E. 96, 100: "Subject to applicable qualifications and limitations, where a traveler about to enter upon a crossing has an opportunity, by exercising his sense of hearing or sight, to discover an approaching train in time to stop in a place of safety, it is his duty under such circumstances to look and listen, and, if he fails to do so, or fails or neglects, as he approaches the crossing, to see or discover an approaching train dangerously near the crossing, which the evidence shows he could or must have discovered in the exercise of ordinary care, had he looked or listened, such failure to look and listen amounts not only to negligence, but to gross negligence as a matter of law."

The train which struck the deceased approached from his right. Admittedly, the deceased could not have seen a train on defendant's tracks until he reached a point on the public road approximately 325 feet from the crossing, due to tall pine trees growing between the road and the tracks. From that point to the crossing, the distance between the public road and the railroad tracks varies, but at no point is it greater than approximately 130 feet. The grade level of the public road, the intervening area, and the railroad tracks was approximately the same for a distance of 200 feet from the crossing. In this area between the public road and the railroad, there was growing at the time of the collision a thin growth of broom sage, at places about three feet in height, and six to ten scattered pine trees about six feet

tall. There were no other possible obstructions to the view in that area. The height of the train was estimated to be from 14 to 16 feet, which would have made it at least ten feet taller than the broom sage and eight feet higher than the few scattered pines. Pictures of the scene taken shortly after the accident were placed in evidence by both the plaintiff and the defendant and differ in no material respects. They, together with the other testimony, clearly show that the broom sage and scattered pines constituted no material obstruction to the view of a traveler approaching the crossing.

While we think that the testimony clearly shows that the broom sage and few scattered pines constituted no material obstruction to the view of the deceased of an oncoming train, it is uncontradicted that, when the deceased reached a point on the public road forty-five feet from the point of collision with the train, he had passed any obstruction that might have been created by the broom sage and scattered pines and had an unobstructed view of the railroad in the direction of the approaching train for at least a distance of 1,000 feet.

Considering the evidence in the light most favorable to the plaintiff, as we are required to do in determining the issues in this appeal, the conclusion is inescapable that the deceased was guilty of contributory gross negligence and recklessness as a matter of law. The accident occurred on a clear day. The deceased was 36 years of age with no impairment of his sight or hearing. There was nothing to distract his attention. The testimony shows that he approached the crossing, with which he was thoroughly familiar, at a speed of from 5 to 15 miles per hour and had an ample unobstructed view of an approaching train in which to have seen it and avoided the collision. There is no explanation of his driving into the path of the train under the foregoing circumstances except that he failed to exercise even slight care for his own safety. Under the circumstances such would constitute contributory gross or willful negli-

gence and bar recovery by the plaintiff. *Moore v. Atlantic Coast Line R. Co.,* 192 S. C. 406, 7 S. E. (2d) 4; *Breeden v. Rockingham R. Co.,* 193 S. C. 220, 8 S. E. (2d) 366.

Therefore, the trial judge should have granted the motion of the defendant for a directed verdict in its favor, and the cause is remanded for the purpose of entry of judgment in favor of the defendant.

Reversed and remanded.

TAYLOR, C. J., and MOSS and BRAILSFORD, JJ., concur.

BUSSEY, J., dissents.

BUSSEY, Justice (dissenting).

Finding myself unable to agree with the conclusion reached in the majority opinion, I shall endeavor to set forth my divergent views as concisely as possible. To do so concisely is not an easy task since the sole question before us is whether the evidence is susceptible of more than one reasonable inference and the record is a most voluminous one, including a rather large number of exhibits. I shall, however, first set forth what I consider to be some additional important facts, not set forth in the majority opinion, and then point to some factual conclusions contained in the majority opinion which, in my view, are not in accord with the record as I read it.

As the track approaches the crossing in a southerly direction it comes upgrade to a crest seven hundred feet north of the crossing, at which point the track is 4.89 feet higher than it is at the crossing. Maps placed in evidence by appellant only show the track for a distance of one thousand feet north of the crossing, and for the first three hundred feet north of the crest of the grade (which is seven hundred feet north of the crossing) the slope downward in a northerly direction is very gentle. Beyond that point the record does not disclose the length or the extent of the upward grade of the track to the crest.

To the south of the crossing, photographs in evidence show that the track curves to the left and that the area on

the inside of the curve is forested. Just how far south of the crossing the curve starts, or where the forest starts, is not disclosed by the record.

Attention should be called to the evidence as to the condition of the crossing itself. The actual crossing, as maintained, was only wide enough for one lane of traffic. The evidence is in conflict as to its state of repair but there is evidence to the effect that it was not in a good state of repair; that there were holes in the ballast, and that the crossing was very rough. There was eye witness evidence to the effect that the decedent was going not over five to ten miles per hour as he approached the crossing, and that he further slowed to the point where he was barely moving or creeping as he traversed the tracks. It is readily inferable from the evidence that the condition of the crossing was such that he, in point of fact, changed gears and went across in low gear in order to negotiate the crossing with safety to himself and his vehicle.

The majority opinion states that it was uncontradicted that the train approached the crossing at approximately its scheduled speed of seventy miles per hour. There is evidence from witnesses for appellant that the regulation speed at this spot was seventy-five miles per hour; eye witnesses approximated the speed as seventy-five miles per hour, and there was evidence, I think, from which the jury could have reasonably inferred that the train was behind time and moving at an even greater speed. The complaint alleged and the answer admitted that the tragic accident happened at about 10:40 A. M. There was evidence that it occurred after 10:30, while other evidence reflected that were the train on schedule, it would have arrived at that point at approximately 10:20. The train proceeded for approximately half a mile beyond the crossing before the engineer could bring it to a stop, he testifying that it was in emergency before the impact.

The majority opinion states that the grade level of the public road, the intervening area and the railroad tracks

were approximately the same for a distance of two hundred feet from the crossing. To the contrary, I think appellant's maps show that at a point somewhat less than two hundred feet north of the crossing a bank located upon and within the right of way is 3.3 feet higher than the level of the rails at the crossing, and this bank continues to rise until at a point somewhat more than three hundred feet north of the crossing the same bank is 6.2 feet above the top of the rails at the crossing. The distances from the vantage point of the decedent were considerably less than the above distances as he was approaching the crossing at an angle. There is evidence that his eye level was approximately four feet above the surface of the dirt roadway, and evidence that on top of the aforesaid bank there was broomstraw, Johnson grass, and other vegetation two and a half to three feet tall.

The majority opinion states that "it is uncontradicted that, when the deceased reached a point on the public road forty-five feet from the point of collision with the train, he had passed any obstruction that might have been created by the broom sage and scattered pines and had an unobstructed view of the railroad in the direction of the approaching train for at least a distance of 1,000 feet." This is what is contended by the appellant. I regard the statement, however, as being sharply at issue, rather than uncontradicted.

The right of way of the appellant extends eastward from the center line of the main track a distance of fifty feet. The maps placed in evidence by the appellant show that the telegraph poles are approximately nine feet within the right of way line and are set upon the top of the embankment to the north of the crossing in question. The photographs reflect that the embankment itself extends possibly ten feet more into the right of way, and slopes down into a ditch alongside the passing track. It is inferential that the said bank extended into and occupied some nineteen feet of the right of way, with the result that it to some extent obstructed the view of decedent until his line of vision was thirty-one feet from the center of the main track. There

is evidence to the effect that the easternmost rail of the passing track was seventeen and a half feet east of the center line of the mainline, which means that the distance between the line of the bank and the outer or easternmost rail of the passing track was some thirteen or fourteen feet.

Photographs placed in evidence by both parties show that vegetation was standing not only on the top of the bank, but in the ditch between the bank and the passing track, and on the eastern side or shoulder of the passing track itself. The vegetation growing immediately adjacent to the passing track was not high in the immediate vicinity of the crossing, but the photographs indicate that it had considerable height at a distance of possibly some four hundred feet north of the crossing. Naturally, as decedent rounded the last curve and approached the mainline, the nearer he got thereto the less the bank and vegetation obstructed his view, and, consequently, the further he could see up the track in a northerly direction. Several witnesses testified, however, that one did not have an unobstructed view of the track to the north until practically on the crossing itself, and in view of the foregoing, I think their testimony to such effect was not unreasonable or unbelievable.

Had the decedent been in position to give the track to the north his undivided attention, it is clearly inferable that he could have observed the approaching train in time to stop and avoid a collision. He was, however, under the duty to look both ways. To his left the track curved away to the east and went behind trees; to his right was an embankment, and any approaching train had to come over the crest of a grade seven hundred feet away. In addition, it is clearly inferable that he had to give the crossing itself careful attention in order to get safely across, independently of any approaching train.

There is evidence that the train was moving one hundred ten feet or more per second. On the other hand, there is evidence that decedent approached the crossing at a speed

of five miles per hour, and further slowed down to where he was "creeping" or "barely moving". I am unable to translate "barely moving" or "creeping" into speed in feet per second. At five miles per hour decedent would have been moving seven and a third feet per second. The impact being on the right rear fender of his automobile, the front end thereof must have been at least ten feet across the main track to the west thereof at the time, which means that the front end of the vehicle had moved a total of about sixty feet from the time the vehicle first entered the right of way. If we assume, solely for the purpose of illustration, that his "creeping" or "barely moving" speed, after reducing from five miles per hour, amounted to a speed of four feet per second, such would mean that the train at its relatively greater speed was somewhere in the vicinity of the milepost, fifteen hundred feet north of the crossing, and some eight hundred feet north of the grade crest, at the time the vehicle first entered the right of way. It is entirely conceivable to me that as the decedent entered the right of way he looked to the right, could see past the embankment several hundred feet to the north, but due to a combination of embankment, vegetation and grade, could not see the train fifteen hundred feet away beyond the crest of the grade; that he then looked to the left for any northbound train that might be coming around the curve, and thereafter devoted his attention to the crossing itself. Of course, the evidence does not reflect whether or not decedent looked to his right. His lips are sealed by death. He is, however, clothed with the presumption that he did look. In the absence of proof to the contrary, it is presumed that a person observed the law and conducted himself as a person of ordinary prudence, reason and care. *Thornton v. Seaboard Air Line Ry.*, 98 S. C. 348, 82 S. E. 433.

"This rule is especially applicable to actions for wrongful death. Negligence on the part of the decedent is not presumed; he is, on the contrary, presumed to have exercised due care for his own safety at the time of his injury." 20 Am. Jur., 215, paragraph 217.

Under all of the circumstances, I think that in addition to the presumption, the evidence is clearly susceptible of the inference that he did look. Having done so and not being able to see the train at that moment, I do not think we can soundly hold, as a matter of law, that his failure to again look to his right at the precise moment when and, from the precise point from which he would surely have seen the train, constituted gross negligence on his part. *Gossett v. Piedmont & N. Ry. Co.*, 241 S. C. 501, 129 S. E. (2d) 326.

A traveler approaching a railroad crossing has a right to presume that the railroad will obey the law and give the statutory signals; while the wrongful conduct of the railroad in this regard will not excuse the traveler in the exercise of slight care, yet in determining whether he did use such care, his conduct is to be judged in the light of such presumption. *Thompson v. Southern Ry.*, 208 S. C. 49, 37 S. E. (2d) 278; *Langston v. Atlantic Coast Line R. Co.*, 197 S. C. 469, 15 S. E. (2d) 758; *Harrison v. Atlantic Coast Line R. Co.*, 196 S. C. 259, 13 S. E. (2d) 137; *Cook v. Atlantic Coast Line R. Co.*, 196 S. C. 230, 13 S. E. (2d) 1, 133 A. L. R. 1144.

"It has never been held in this state that one about to cross a railroad track at a public highway or street crossing is under an *absolute* duty to stop, look, and listen before going on said track, unless the exercise of ordinary care and prudence, under all the surrounding facts and circumstances, requires the adoption of such a course, and it is ordinarily a question for the jury to determine, in the application of the standard of due care, whether the attempt of a traveler to cross without looking or listening effectively was excusable or culpable." *Ford v. Atlantic Coast Line R. Co.*, 169 S. C. 41, 168 S. E. 143.

"Of course the failure to give the statutory signals does not relieve a traveler of his duty to look and listen before going upon a railroad crossing. But this rule is not arbitrary as to the time and distance at which such precaution

344

shall be taken. Ordinarily such questions are for the jury."
*Cook v. Atlantic Coast Line R. Co., supra.*

In discussing the evidence, I have, of course, viewed the same, and all inferences reasonably deducible therefrom, in the light most favorable to the respondent as we are required to do. There is sharp conflict in the evidence and particularly on the issue of visibility. Much of appellant's evidence on the issue of visibility, it seems to me however, has to do with what decedent could or could not have seen if the train had been within some three or four hundred feet of the crossing at the time decedent rounded the last curve on the dirt road, entered the right of way, and decided to cross. There is abundant evidence however, from which I think it may be reasonably inferred that at that particular time the train was not nearly so close to the crossing. It is my conclusion that whether or not the decedent was guilty of contributory gross negligence, recklessness or willfullness was an issue of fact which the trial judge properly submitted to the jury, and the judgment of the lower court should, therefore, be affirmed.