Eleanor J. OSBORNE, Plaintiff,

v.

The SOUTHERN RAILWAY COMPANY,
a Corporation, Defendant.

Civ. A. No. 1602.

United States District Court
D. South Carolina,
Columbia Division.

Jan. 25, 1967.

John H. Hydrick, Jr., Lexington, S. C., William H. Duncan, West Columbia, S. C., for plaintiff.

Tompkins, McMaster & Thomas, Columbia, S. C., for defendant.

## ORDER

SIMONS, District Judge.

The within action was tried before me and a jury on September 22nd and 23rd, 1966 in Columbia, South Carolina. During the trial motions by defendant for a directed verdict were made at appropriate stages and denied, and the case was

submitted to the jury with instructions as to the issues involved. After deliberation for several hours the jury was unable to reach a verdict, and a mistrial was declared in due course. Defendant then moved for judgment in accordance with its motion for directed verdict pursuant to Rule 50(b) of the Federal Rules of Civil Procedure which the court now has under advisement.

Plaintiff brought this action to recover for her personal injuries sustained when the car she was driving collided with defendant's train on December 3, 1960, at about 12:14 p. m., near Trenton, in Edgefield County, South Carolina, on a paved farm-to-market road locally known as Weaver Road (S–19–18).

At the place of the collision Weaver Road runs approximately north and south, and defendant's tracks run approximately east and west. Plaintiff, driving her husband's 1958 model Nash Rambler station wagon and accompanied by her eight year old daughter, was headed south on Weaver Road. The train, consisting of a switch engine and eleven empty wood rack cars, was headed west. The left front portion of the automobile collided with the right front portion of the engine. According to the highway patrolman's testimony the automobile laid down eighty-one feet of skid marks before it reached the tracks.

Weaver Road is a two-lane, asphalt surfaced road. Defendant's track in this area is a spur track off of its main line from Augusta, Georgia to Columbia, South Carolina, which runs from Trenton to Edgefield and passes a woodyard of International Paper Company adjacent to the crossing in question. The crossing was posted with the usual cross-arm signs, one in the northwestern corner for southbound drivers and another in the southeastern corner for northbound traffic. In addition there was a highway department advance warning sign, a yellow disk with a black cross and the black letters "RR" on it, 300 feet north of the crossing on the right-hand side of the road which plaintiff passed as she approached the crossing. Plain-

tiff had lived in this area about a mile from the crossing for many years, was very familiar with the crossing, and the fact that trains used the track daily.

Visibility conditions at the crossing were good. The weather was clear and rather cold. Introduced in evidence were a plat and several photographs taken at the scene four days after the collision under similar time and weather conditions (defendant's Exhibits "A" through "L"). The accuracy of the photographs was corroborated by plaintiff's husband and Patrolman Brown of the South Carolina State Highway Department, who investigated the accident on the day of the collision. Plaintiff on the other hand testified that the weeds and bushes were higher than as shown by the photographs, and that in her opinion they did not represent accurate pictures of the scene as it existed on the day of the accident.

Nevertheless, plaintiff estimated that from a point on the highway about fifty feet from the crossing she could see about 700 or 800 feet up the track to her left in the direction from which the train approached. From a point 100 feet back she estimated that she could see up the track to her left for about 200 feet.

According to all the testimony the train at the time of the collision was traveling slowly, at about twenty miles per hour, and the speed of the automobile, in the light most favorable to plaintiff, was about thirty-five miles an hour as she approached the crossing. She testified that as she reached a point about 100 feet from the crossing she took her foot off the accelerator, reducing her speed to about thirty miles per hour, looked both to her right and left, saw and heard nothing and proceeded on toward the tracks without applying her brakes or looking again, until her eight year old daughter yelled that the train was coming. Plaintiff estimated at that time that she was about two or three car lengths from the crossing and that the train was just about to reach the crossing. She then heard the train blow

its whistle for the first time. She applied her brakes and skidded into the train with the front of the engine striking the left front of her car.[1]

1. With reference to the manner in which the collision occurred plaintiff testified on direct examination as follows:

"Q. All right. Describe to the Court and the jury, about this wreck, just tell them in your own words where you had been, and what happened?

A. Well I had been to Batesburg to pick up my husband's car, it had a new motor put in it; and because he wanted to hunt, I went to get it. And on the way back, I took the back way home, which this crossing is on; and got hit. That's about what happened. I did not see the train until I was very close to it, and I did look, and I did not hear the train until it was on the crossing, it did blow its whistle finally, but it was too late then.

\* \* \* \* \*

Q. As you approached the track, what did you do?

A. As I approached the track, I slowed down, which I customarily do. I did not stop, because I wasn't expecting a train, but I slowed down and looked both to the left and right, and I didn't see the train. And I kept going, and then Pam saw it, and I hit my brakes about the time I hit my brakes the whistle blew and just seemingly a few seconds later we collided, the train hit me.

\* \* \* \* \*

THE COURT: When did you see, first see the train?

A. I did not actually see it myself until after Pam saw it and yelled, there the train was, or Mama the train, and I guess I may have been a hundred feet from the track then, if that far. I don't know, I didn't get out and measure it. But it might have been that far.

\* \* \* \* \*

Q. And as you approached, you said you looked to your left?

A. Yes, I looked to my left, and to my right also. I did not see the train at the time I looked, and I guess that it was because of the flat cars that were on the train, which were hard to see at any time, and the engine I guess was behind one of these obstructions to keep me from seeing it.

\* \* \* \* \*

Q. Can you give us any explanation as to why you did not see the train?

A. Well, the train, as I said, was evidently hidden by the obstructions that were close to the track, and the flat cars that were on it, kept me from seeing that part of the train, and of course, there was no signal given until the train was right on the crossing, which would make one think there wasn't one anywhere close too."

On cross-examination plaintiff testified as follows:

"Q. All right, Mrs. Osborne, when you were at a point fifty feet before you reached the railroad track, heading South on Weaver's Road, how far to your left could you see the approach of a train if you had been looking?

\* \* \* \* \*

A. I guess, if I were close I could see maybe 700 or 800 feet.

Q. All right. When you were so much as 100 feet back from the crossing, and looked to your left, how far up the track could you have seen the approach of a train?

\* \* \* \* \*

A. My estimate would be around 200 feet.

\* \* \* \* \*

Q. When you saw the train, did you or not then apply your brakes?

A. Yes, I applied my brakes as soon as I saw it.

\* \* \* \* \*

Q. Now, as far as the application of your brakes was concerned, at the time you applied your brakes, how fast were you going?

A. I imagine at that time I was driving between thirty and thirty-five miles an hour when I hit my brakes.

Q. And when you applied your brakes you were how far back from the crossing?

A. I would judge that I was about in the length of time it took me to react and apply my brakes that I was maybe two car lengths from the track.

\* \* \* \* \*

Q. And where were you when you first looked?

A. Well, I guess—

Q. How far back from the crossing?

A. I would guess that I was about 100 feet from the crossing.

THE COURT: How far back?

A. About 100 feet or maybe 150.

\* \* \* \* \*

Q. You looked one time. \* \* \*

\* \* \* \* \*

There is a dispute in the testimony as to whether the train gave the statutory warning signals as required by Section 58–743 [2] of the 1962 South Carolina Code of Laws. Plaintiff's testimony provides a reasonable inference that such statutory signals were not given properly, as she first heard the train whistle as the engine reached the crossing. Of course the crew members of the train testified that such signals by bell and whistle were given.

■ In deciding defendant's motion here all of the testimony must be considered in the light most favorable to plaintiff. Thus, for the purposes of this motion the court finds that defendant failed to give the statutory signals as its train approached the crossing on the day of the accident, which failure contributed proximately to the accident. Under such circumstances, for defendant to prevail in its motion it must appear clearly from the entire record that plaintiff was guilty of contributory gross or wilful negligence as a matter of law. Section 58–1004 of the 1962 South Carolina Code of Laws.[3] Wingate v. Seaboard Air Line R.R., 244 S.C. 232, 137 S.E.2d 258 (1964).

The determinative question presented is: Considering the evidence most favorably to plaintiff, was she as a matter of law guilty of gross negligence which was at least a contributing or concurrent proximate cause of the collision and her resulting injuries and damages?

■ If conflicting reasonable inferences may be deduced from the evidence, then such conflict must be resolved by the jury. If the only reasonable inference created by the evidence is that plaintiff was guilty of contributory gross negligence, then defendant should prevail in its motion. Carter v. Atlantic Coast Line Ry. Co., 194 S.C. 494, 10 S.E.2d 17, (1940); Taylor v. Atlantic Coast Line R.R., 217 S.C. 435, 60 S.E.2d 889 (1950).

■ In weighing the record, the court is mindful of the principle that while the railroad is required to give the statutory crossing signals such failure does not relieve a traveler of the duty to exercise due care to observe the approach of trains at a crossing. The South Carolina Supreme Court recently stated in Wingate v. Seaboard Air Line R.R., supra, 137 S.E.2d at page 259:

"[W]here a traveler about to enter upon a crossing has an opportunity, by exercising his sense of hearing or sight, to discover an approaching train in time to stop in a place of safety, it is his duty under such circumstances to look and listen, and, if he fails to do so, or fails or neglects, as he approach-

---

A. I looked one time, did not see the train. I proceeded on, and I looked again when my daughter yelled.

\* \* \* \* \*

Q. When Pam yelled it was then you made your brake application?

A. Yes.

Q. Is that the first time you had applied your brakes as you came up to this crossing?

A. Yes, it was."

2. Section 58–743 provides in part as follows:

"A bell of at least thirty pounds' weight and a steam or air whistle shall be placed on each locomotive engine or interurban car and such bell shall be rung or such whistle sounded by the engineer, fireman or motorman at the distance of at least five hundred yards from the place where the railroad crosses any public highway, street or traveled place and be kept ringing or whistling until the engine or interurban car has crossed such highway, street or traveled place."

3. "*Section 58–1004. Injuries at crossings; penalty and damages.* If a person is injured in his person or property by collision with the engine or any car of a railroad corporation at a crossing and it appears that the corporation neglected to give the signals required by the General Railroad Law and that such neglect contributed to the injury, the corporation shall be liable for all damages caused by the collision or to a fine recoverable by indictment, unless it is shown that in addition to a mere want of ordinary care the person injured or the person having charge of his person or property was at the time of the collision guilty of gross or wilful negligence or was acting in violation of the law and that such gross or wilful negligence or unlawful act contributed to the injury."

es the crossing, to see or discover an approaching train dangerously near the crossing, which the evidence shows he could or must have discovered in the exercise of ordinary care, had he looked or listened, such failure to look and listen amounts not only to negligence, but to *gross negligence as a matter of law*." (Emphasis added.)

The South Carolina Court in Arnold v. Charleston & West. Carolina Ry. Co., 213 S.C. 413, 49 S.E.2d 725, at page 731 (1948), quoting with approval from Robison v. Atlantic Coast Line R.R., 179 S.C. 493, 184 S.E. 96, 101 (1936), stated:

" 'Even though the view of the railroad track be partially obstructed at a crossing, that fact does not relieve the traveler of the obligation to look and listen for an approaching train. The very fact of the existence of such obstruction, and particularly when it is known to the traveler, imposes additional care and caution upon him when approaching the track. The right of a railroad company at a highway crossing is superior to the right of a traveler upon a highway, but this superior right does not relieve the company of reasonable and ordinary caution to prevent accidents at such crossing, and this degree of care may be affected by obstructions which prevent the track from being seen as a train approaches. Both the traveler and the company are charged with the same degree of care; the one to avoid being injured, and the other to avoid inflicting injury. The care of each must be commensurate with the risk and danger involved. The greater the risk, the greater the care.' "

A factual situation quite similar to the instant case was considered by the South Carolina Supreme Court in Breeden v. Rockingham R. Co., 193 S.C. 220, 8 S.E.2d 366 (1940). In reversing a jury verdict for plaintiff and holding that the trial judge should have directed a verdict for defendant, the court stated at 8 S.E.2d page 368:

"It is the duty of a traveler, upon the approach to a railroad crossing of which he is aware, to use due care to observe the approach of trains at said crossing for, as stated in Robison v. Atlantic Coast Line R. Co., 179 S.C. 493, 184 S.E. 96, 100, 'it is always train time at a railroad crossing'. It cannot be doubted, therefore, that one who approaches a railroad crossing with which he is entirely familiar, in the daylight, where the view of approaching trains, to his knowledge, is obstructed until a point is reached approximately thirty feet from the railroad tracks in an automobile at a speed of thirty to thirty-five miles per hour, without slackening his speed or taking any precautions to have his automobile under such control at a point where he could obtain a view of an approaching train as to be able to stop before reaching the crossing is guilty, as a matter of law, not only of negligence, but of gross negligence."

The circumstances in Bishop v. Atlantic Coast Line R.R. Co., 213 S.C. 125, 48 S.E. 2d 620 (1948) appear to be so closely akin to those in our case that the affirmation by the Supreme Court of a directed verdict for the railroad by the lower court is quite persuasive. At 48 S.E.2d pp. 624–625, the Court held:

"The only question for our determination, therefore, is whether the deceased was guilty of gross contributory negligence as a matter of law. The inquiry is: Could he by the reasonable use of his senses in the performance of his duty to look and listen under the circumstances surrounding him have discovered the presence of the backing locomotive in time to avoid the accident? If so, would such omission of duty constitute under all the circumstances gross negligence as a matter of law? In approaching this crossing, the duty rested upon the deceased to use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances, to look and listen in both directions for approaching trains unless prevented from doing so by the fault of the railroad company, and to the extent the matter was under his control, to look and listen at a place and in a manner

that would make the use of his senses effective. Chisolm v. Seaboard Air Line Railway Co., 121 S.C. 394, 114 S.E. 500. He did not conform to due care or even slight care if he undertook to look at a point where he knew that obstructions would prevent him from seeing an approaching train, for it would be futile for a traveler to look at a place where he knew beforehand he could not see. Carter v. Atlantic Coast Line Railway Co., 192 S.C. 441, 7 S.E.2d 163. Of course, the duty of a traveler to look and listen in both directions for approaching trains is not an absolute one, but may be qualified by attendant circumstances; and it is ordinarily a question for the jury in the application of the standard of due care to say whether the attempt of the traveler to cross without looking and listening effectively was excusable or culpable. Chisolm v. Seaboard Air Line Railway Co., supra. However, where the evidence shows that the opportunity of the injured person or deceased for seeing or hearing the approaching train was such that he could not fail to have seen or heard it in time to avert the accident if he had used due care in looking and listening, he is guilty of contributory negligence as a matter of law."

From the foregoing expressions of the South Carolina Supreme Court by which this court is bound in this diversity suit under the *Erie* doctrine,[4] it is seen that the law in this state is quite clear as to the respective duties of a railroad in the operation of its train and a motorist in the operation of his automobile as they approach a public crossing. Such legal guidelines must be carefully considered and applied to the facts of each case as they present themselves. No two cases are factually identical, thus no rigid formula may be established, and obviously the difficulty encountered is applying these legal principles to the facts, or the reasonable inferences deducible therefrom.

When the court overruled defendant's timely motions for a directed verdict during the jury trial it had considerable misgivings as the evidence revealed a lack of care on the part of plaintiff. The court has now studied carefully the testimony of plaintiff and the photographs in the record; has heard arguments of counsel, and has had presented able written briefs in reference to defendant's motion for a directed verdict after the jury was unable to agree, pursuant to Rule 50(b), supra.

■ In applying the foregoing well established principles of law to the facts and inferences arising therefrom in this case which have been considered in the view most favorable to plaintiff, the conclusion is inescapable that plaintiff was guilty of contributory gross or wilful negligence as a matter of law. The accident occurred on a clear dry day. The plaintiff was thirty-one years of age, in good health, and with no impairment of her sight and hearing. The car she was driving was in good mechanical condition. There were no diverting conditions, such as a rough crossing, other traffic, fog, rain, or the like tending to draw her attention from the duty at hand—to look and listen, and to see and hear the approaching train. She was very familiar with this crossing, having used it almost daily, and if there were sufficient obstructions to partially conceal the train approaching from her left (the photographs in evidence forcefully demonstrate the lack of any such obstructions), she was well familiar with them. Rather than to excuse her from seeing the train, they only imposed a greater duty upon her to approach the crossing with more caution for her own safety. Robison v. Atlantic Coast Line R.R., supra.

There is no credible evidence of excessive speed, the train was traveling slowly and she was approaching the crossing at thirty-five miles per hour. Under her own admission she could see to her left up the track in the direction from which the train came for a distance of about 700 to 800 feet when she was fifty feet from the crossing. Nevertheless, she

4. Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

relied upon one look to the right and left when she was approximately 100 feet from the crossing. She then proceeded toward the track without looking up and down the railroad tracks again and without applying her brakes, or slowing sufficiently to have her car under control, so as to be able to stop if a train were approaching. She placed undue reliance on her one look about 100 feet back from the crossing and her belief that it was not "train time" at that appointed time and place. Under the circumstances, due care dictated that she look again as she neared the crossing at such place as she would have had an unobstructed view in both directions, and that her speed be so reduced she would have been able to stop her car in a place of safety and avoid a collision, if a train were approaching. Plaintiff's testimony quoted in note 1, supra, furnishes no explanation or excuse for her driving into the path of defendant's train, except that she failed to exercise even the slightest degree of care for her own safety. Her actions constituted contributory gross or wilful negligence, and she is barred from recovery.

Defendant's motion for a directed verdict is granted and judgment shall be entered for it.

And it is so ordered.