15008

MOORE v. ATLANTIC COAST LINE R. CO.

(7 S. E. (2d), 4)

May, 1938.

*Mr. W. B. Norton,* for appellant,

*Messrs. Woods & Woods,* for respondent,

January 31, 1940.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

This is an action for recovery of damages arising out of a collision between an automobile, driven by plaintiff's intestate, Paul Moore, a white boy 17 years of age, and one of respondent's regular passenger trains, said collision hav-

ing occurred at a crossing on the outskirts of the Town of Sellers in Marion County, about 1:00 o'clock p. m., August 11, 1934, resulting in the instant death of the said Paul Moore.

The alleged specifications of negligence, willfulness, wantonness and recklessness are: "That the defendant, its agents, servants and employees ran a train consisting of two locomotives and a long train of passenger cars from behind defendant's tool and other houses and obstructions, at a high and dangerous rate of speed, greatly in excess of a reasonable speed under the circumstances, at the time running behind its regular schedule, over and upon the said highway, without ringing the bell, blowing the whistle, or giving any signal required by law to be given at railroad crossings."

The answer contains a general denial, and sets up as a defense "decedent's sole negligence, gross negligence and willfulness and his contributory negligence, gross contributory negligence and contributory willfulness."

The case was tried at the May, 1938, term of Court of Common Pleas for Marion County before his Honor, Judge Dennis, and a jury. At the conclusion of the testimony, counsel for defendant moved for direction of a verdict in its favor on the following grounds: "(1) Because it appears from the evidence that the deceased approached and entered upon the crossing immediately in front of a fast train without taking due or even slight care for his own safety; and that his own contributory negligence, gross contributory negligence and contributory recklessness was a proximate cause of his injury. (2) Because it appears from the evidence that the deceased in violation of law, entered upon and crossed a State highway immediately adjacent to the railroad track without stopping, when, if he had stopped, he could not have failed to see and hear the train; and his violation of law was gross and reckless and contributed to his injury as a proximate cause thereof."

This motion his Honor granted, upon the grounds stated, delivering his ruling orally from the bench, from which ruling this appeal is taken. Error on the part of the trial Judge is alleged under nine exceptions, but not so many questions are raised for determination on this appeal. The first exception counsel has abandoned. .

The question raised by Exceptions 2 and 3, alleging error in the exclusion of certain testimony, is thus stated by appellant's counsel: "Was there error in excluding testimony as to grade of track and elevation of tool house on defendant's right-of-way; it being alleged in complaint tool house was an obstruction to view?"

We think the learned Circuit Judge did err in ruling as incompetent the questions propounded by counsel in the particulars complained of, and so far the reason that any testimony tending to prove obstructions to decedent's view of the railroad as he approached the crossing were responsive to the allegations contained in the complaint. ·However, the record reveals that at least the substance of the testimony then elicited was subsequently permitted to be introduced. For this reason, and in view of all of the testimony hereinafter referred to, we think appellant suffered no prejudice by his Honor's ruling. Therefore, these exceptions are overruled.

Exception 4 ·alleges error: "In that his Honor directed a verdict for defendant upon an erroneous Finding of Fact; to wit: That plaintiff's negro witness, Sylvester Jones, had testified that plaintiff's intestate 'knowing the train to be coming either from hearing it, or seeing it—did not slow down, did not stop at the "stop" sign on the crossing of the paved road, did not slow down before he got on the track'; whereas, there was no testimony whatsoever to such effect, or from which any inference could be drawn that the deceased 'knowing' the train to be coming, went upon the railroad track." Counsel has evidently misapprehended the language employed by the trial Judge

in his summary of testimony upon which his holding was based. We find in the record nothing from which it may be inferred that his Honor "found as a fact" that plaintiff's intestate either saw or heard the train in time to avoid the collision; but we do find that, in announcing his ruling, he used these words, "as I recall Sylvester Jones, a witness for the plaintiff, testified that knowing the train was coming, either from hearing it or seeing it, he kept his eye fixed on this crossing." Assuredly the presiding Judge was referring to the witness Jones, and *not* to Paul Moore, the deceased, as the one, "knowing the train was coming either from hearing it or seeing it." Hence, this exception must be overruled.

Exceptions 5, 6, 7, 8 and 9, while argued more or less separately by appellant's counsel, are closely related in point and may appropriately be considered together, and as raising the real issue in this case, viz.: Did the trial Judge err in finding and holding that Paul Moore was guilty of gross contributory negligence and contributory recklessness as the sole proximate cause of his death, and directing a verdict in favor of the railroad company on that ground?

The right answer to this question necessarily calls for a review of all the testimony introduced upon the trial, and a consideration thereof in the light most favorable to the appellant. *Ford v. A. C. L. Railroad Company*, 169 S. C., 41, 168 S. E., 143.

From the testimony the following facts appear as undisputed: Respondent's double-track main-line railroad passes through the Town of Sellers, a well-populated village, and intersects at a slight angle with the public (dirt) road about one-half mile south of the depot, over which road decedent was traveling and at said crossing was killed by respondent's south-bound passenger train, made up of two very heavy locomotives and thirteen coaches. A paved highway extends along the east side of and parallel with the railroad track, so that one traveling west on the dirt road would cross the

paved highway before reaching the railroad crossing. Approximately eight hundred ninety-one feet north of the crossing on the east side of the track and immediately adjacent thereto is a tool house 15 feet long, 12 feet wide and 10 feet high. From about the point of the tool house the paved highway descends and is lower at the crossing than is the tool house, but the elevation of the crossing and the base of the tool house is the same. At the point where the dirt road enters the paved highway there is a "stop" sign, and at the railroad track in the customary location there is a cross-buck railroad crossing sign. As one travels west over said dirt road, for a distance of at least one hundred sixty-five or seventy feet before reaching respondent's south-bound track (the one on which decedent was killed), the only obstructions to his view of the railroad tracks or trains moving thereon from the crossing as far northward as the depot, a distance of approximately one-half mile, are the tool house hereinbefore referred to and the customary line of telegraph poles, spaced the usual distance apart. Many fast trains are operated over this railroad daily, which fact decedent knew. He had resided in the vicinity of the crossing for five years, passed over it frequently and was very familiar with the surroundings.

Shortly before noon on the day he met his death, the decedent and his brother, Howard Moore, passed over this crossing in a car together en route to Marion and on their return homeward each of the brothers drove a car, Paul driving and old coupe he had purchased on the trip. As they approached this crossing from the east side, Howard was driving the lead car while Paul followed very close behind in his car alone. As to what then occurred, we have the testimony of the Negro, Sylvester Jones, who was standing 150 of his steps distant from the crossing. This witness was called by plaintiff's counsel, and the more important part of his testimony pertinent to the question here involved reads thus:

## DIRECT EXAMINATION

"Q. Did you see the two Moore boys on this day? A. Yes, sir.

"Q. How were they traveling? A. In a car apiece—each one had his car. * * * Howard was the first one. He went on the railroad track first. I thought they were going to stop between the highway and the railroad, and they didn't stop. The front car beat it across. The train blew twice 'toot! toot!' Just as he got over the other car run on and took the lick.

"Q. The cars were traveling close behind the other? A. Yes, sir.

"Q. Were those boys driving fast? A. No, sir.

"Q. How fast were they driving? A. I don't know sir; they were going very slow. They were driving close on another.

"Q. Did you see the train before it struck this car? A. I saw it just when it took the car up. I was watching the boys. * * *

"Q. Where were the boys whenever you first saw the train? A. Them boys were somewhere just fixing to pass by the end of the garden * * *

"Q. You heard the noise of the train coming on down? A. Yes, sir.

"Q. What did you do? A. I didn't do nothing but look at 'em. * * *"

## CROSS EXAMINATION

"Q. You saw them coming back and they were in two cars? A. Yes, sir.

"Q. Which car was in front? A. The one that they went in. * * *

"Q. Were they close together? A. Yes, sir; very close together.

"Q. How fast were they running? A. I don't know. The boys were driving mighty slow. * * *

"Q. Is there a stop sign for the highway? A. Yes, sir.
* * *

"Q. Did they stop at all? A. They went on.

"Q. Did they slacken the speed any? A. No, sir; held the same speed and went right on.

"Q. Where were they when you first heard the engine? A. Just passing that garden. * * * They could have plenty of time to stop on the side of the highway. * * *

"Q. You didn't hear any little blast? A. That is what I am talking about.

"Q. Where were they when you heard those? A. The train, when he blowed that, he was next McCall's house then. I could see it then from where I was standing.

"Q. Were they on the track, or where? A. The front car was on the track when he blowed twice 'toot! toot!' * * *.

"Q. Could you see whether this boy looked or not? A. I ain't see him turn his head. I watched him pretty tight.

"Q. Why were you watching so close? A. I knowed there was going to be death there if he went across that railroad.

"Q. They didn't stop before they got to the paved road? A. They didn't stop at all.

"Q. Didn't slack the speed? A. No, sir.

"Q. This boy did look? A. I ain't seed him look.

"Q. What sort of weather was it that day? A. Fair weather."

The foregoing testimony is not contradicted by any witness, but is corroborated in part by the witness, Thompson, respondent's fireman. Decedent's brother, Howard Moore, who was driving the lead car and barely escaped, and whose testimony would perhaps have thrown further light on the main issue here involved, was not called as a witness, his absence being accounted for by his illness at the time of trial.

There is no conflict in the testimony as to the obstructing objects—or their location—which could have obscured one's view of the train from the road over which decedent approached the crossing; nor is there any dispute about the

fact that the objects mentioned could not have interfered with the decedent's view of the train after it reached the tool house—a distance of near nine hundred feet above the crossing—after he had reached the edge of the paved highway. But there is a conflict of testimony as to one's view of a train between the tool house and depot, plaintiff's witnesses testifying that the said tool house created a "blind spot" which would cut off one's view of the train at a certain point. However, it is evident that this house—aided by the telegraph poles—is too small to have obscured the view of a train approximately twelve hundred feet in length in its otherwise clear approach from the depot to the tool house —a distance of at least one quarter-mile. There is likewise some conflict of testimony as to the train's running behind schedule and as to its speed. But from all testimony, it is evident that said train was only a few minutes late, and was running at a speed of approximately seventy miles per hour when the collision occurred. There is also a sharp conflict of testimony regarding the giving of signals, plaintiff's witnesses testifying that no crossing signals were sounded and defendant's witnesses testifying that all signals which the law requires were given—just as we usually find in cases of this nature.

It is this conflict of testimony upon which counsel ■ bases his contention that the case should have been submitted to the jury, citing in support thereof several cases, including *Bamberg v. A. C. L. R. R.,* 72 S. C., 389, 392, 51 S. E., 988; *Osteen v. Southern Ry.,* 76 S. C., 368, 57 S. E., 196; *Miller v. A. C. L. R. Co.,* 140 S. C., 123, 138 S. E., 675; and *Ford v. A. C. L. R. Co.,* 169 S. C., 41, 168 S. E., 143, 156. To the principles announced by the Court in these cases, as pertains to the point here at issue and as thus expressed in the *Ford case,* this Court now adheres: "It is also well established in this jurisdiction that if the facts, which if true would constitute evidence of negligence, are controverted, or if not in dispute there may be

a fair and reasonable difference of opinion as to whether the inference of negligence may be drawn therefrom, or if in controversy and the inferences properly deducible therefrom are doubtful, or if they tend to show both parties guilty of negligence or willfulness and there may be a fair difference of opinion as to whose act produced the injury complained of as a direct and proximate cause, then the question becomes issuable and must be submitted to the jury under appropriate instructions."

Upon this recognized principle counsel insists that, even though plaintiff's intestate was guilty of contributory negligence, since there was evidence of failure to give the statutory crossing signals and evidence of the excessive speed of the train under the surrounding circumstances, this made an issue for the jury to determine whose negligence was the proximate cause of decedent's death. Of course, a failure to give the crossing signals constitutes negligence *per se* and as to whether or not that negligence was the proximate cause of the injury is ordinarily a question for the jury. And, too, as to whether or not a train is operated at a safe, excessive or reckless rate of speed, under surrounding circumstances and conditions then existing, and as to whether or not such excessive or reckless rate of speed is the proximate cause of the injury likewise presents a question ordinarily for the jury. But, another equally well-recognized principle is to be reckoned with in this case, viz.: If the only reasonable inference to be deduced from all the testimony is that the gross negligence of plaintiff's intestate operated as the proximate cause of his death, it is for the Court, and not the jury to so declare.

As the Court said in the *Chisolm case, Chisolm v. S. A. L. R. Co.,* 121 S. C., 394, 114 S. E., 500, 503, "A railroad company and a traveler on a highway crossing are charged with a mutual duty of keeping a lookout for danger, and the degree of vigilance required of both is in proportion to the known risk   *   *   * ."

Under ordinary circumstances a traveler approaching a railroad crossing, who has full opportunity of seeing an approaching train in time to avoid a collision and who does not look or exercise the slightest care for his safety, the testimony being susceptible of no other reasonable inference, is guilty of gross negligence and the Court may so declare. However, when there are circumstances, unusual or extraordinary conditions surrounding him by which he would reasonably be influenced and his attention thereby diverted, tending to explain his apparent gross negligence, and not created or controlled by such traveler himself, the issue of his gross negligence becomes one of fact for the jury. *Bain v. Northwestern Railroad Co.*, 120 S. C., 370, 113 S. E., 277; *Chisolm v. S. A. L. Railroad Co.*, 121 S. C., 394, 114 S. E., 500.

As clearly appears from the testimony, hereinbefore referred to, as plaintiff's intestate approached the crossing in question, from the time he reached the point at least 165 feet therefrom, there was nothing to obstruct his view of the approaching train after it passed the little tool house—a distance of near nine hundred feet—and only that tool house and line of telegraph poles to interfere with his view up the track for approximately one-half mile. He was very familiar with the crossing and its surroundings. So far as the evidence shows the crossing was not defective in any respect, the complaint not even so alleging. The day was light and the weather perfectly clear. There were no unusual conditions, surrounding circumstances or anything occurring near to divert his attention from respondent's approaching train. He continued his approach to the crossing at a very slow speed, passed the highway "stop" sign, crossed over the paved highway, never stopped, retarded his speed or turned his head, crossed over one railroad track and as he reached the second was struck by respondent's south-bound train. The testimony establishing this state of facts, is uncontradicted. The inevitable conclu-

sion, therefore, is that plaintiff's intestate, not having exercised even slight care for his safety as he approached the crossing in question, was guilty of gross contributory negligence as the proximate cause of his death. Hence, it follows that the trial Judge's order granting respondent's motion for direction of a verdict in its favor on the first ground stated, and hereinbefore reported, must be sustained.

While the foregoing conclusion renders unnecessary a consideration of error alleged by appellant as to respondent's second ground for the motion, suffice it to say that violation of a highway traffic regulation by a traveler constitutes negligence *per se*; but unless the violation of such regulation is a proximate cause of the injury it does not bar a recovery, and such question is ordinarily for the jury. However, in the case at bar, the failure of plaintiff's intestate to stop at the highway "stop" sign constitutes a link in the chain of evidence going to prove gross negligence on his part in approaching said railroad crossing.

The judgment of the Circuit Court is accordingly affirmed, and it is so ordered.

Mr. Chief Justice Bonham and Messrs. Justices Baker and Fishburne concur.