516

18411

Ronald W. RUSSELL, as Administrator of the Estate of Eula Mae Baker, Respondent, v. SEABOARD AIR LINE RAILROAD COMPANY, Appellant.

(144 S. E. (2d) 799)

*Messrs. deLoach & deLoach,* of Camden, and *John H. Lumpkin* and *Boyd, Bruton, Knowlton & Tate,* of Columbia, for *Appellant,*

*Messrs. Murchison & West* and *Donald H. Holland,* of Camden, and *Arthur L. Jones,* of Kershaw, *for Respondent,*

October 25, 1965.

Brailsford, Justice.

The plaintiff's intestate, Eula Mae Baker, was killed on January 1, 1963, at about 10:30 P.M., when her Chevrolet Corvair automobile was struck by a crack passenger train of the defendant Seaboard Air Line Railroad Company at a crossing over Main Street (S. C. Highway 341) in the town of Bethune, South Carolina. This action against the railroad company for her alleged wrongful death resulted in a verdict for plaintiff for $45,000.00 and the company has appealed on a number of exceptions. Under our view of the case, we need consider only those exceptions which charge error in the refusal of the court to direct a verdict for the defendant upon the ground that Mrs. Baker and her minor son, the driver of her automobile, either or both, were guilty, as a matter of law, of such gross contributory negligence, recklessness and willfulness as to bar recovery. The following facts are undisputed.

On the day of the collision, Mrs. Baker and her sons, Clifton and Winifred, left Kershaw, South Carolina, at about 4:00 P.M and drove to Myrtle Beach Air Force Base. Clifton was stationed at this base and was returning to duty after spending Christmas leave with his family. Winifred was eighteen years old and lived with his mother and father in Kershaw. The automobile in which they traveled was owned by Mrs. Baker, who was an active woman and an experienced driver. Clifton drove to Myrtle Beach where he disembarked, and Winifred drove on the return trip.

Winifred and Mrs. Baker were familiar with the route which they followed from Kershaw to Myrtle Beach and return, including the railroad crossing on which the fatal accident occurred. They arrived at Bethune about 10:30 P.M. Their route through town was in a westerly direction along Main Street. United States Highway No. 1 intersects

this street some five hundred feet east of the railroad crossing. The intersecting highway and the railroad tracks run approximately north and south; both intersect Main Street at right angles. For a block or more on either side of the railroad crossing, Main Street is sixty feet in width from curb to curb, with a grass strip and sidewalk on both sides. The area is lighted by modern vapor street lights.

From a point about midway between U. S. No. 1 and the crossing, only two small buildings, approximately one hundred feet apart, are located on the northern side of Main Street. The unpainted frame building nearest the track is sixty-five feet east of the near rail. These buildings partially obstruct a traveler's view of a locomotive approaching from the north until he passes the frame building, sixty-five feet from the track. A twenty foot wide paved street runs in a northerly direction from Main Street parallel to the railroad track. On reaching the entrance to this street, some forty odd feet east of the track, a traveler has an almost unlimited view of a locomotive approaching from the north, until, on nearer approach, his view is affected by a 15′ x 25′ tool house between the parallel street and the railroad tracks one hundred feet north of the center of the crossing. The tool house is ten feet east of the track and from this point the view to the north is again unlimited.

As Winifred and Mrs. Baker traveled toward the crossing from the east, a passenger train, consisting of three diesel locomotives and eighteen cars, approached it from the north. The lead locomotive displayed a standard headlight, designed to illuminate the track ahead, and a Mars light, which oscillated in a figure eight for the purpose of attracting attention to the approach of the train. Many other lights were visible through windows in the locomotives and cars and in the vestibules between the cars.

The train passed over two crossings in Bethume before reaching Main Street. The automatic bell was turned on for the first of these and rang continuously until after the collision. The engineer sounded the whistle signal for all three

crossings, which resulted in the practically continuous sounding of the whistle for a much greater distance than the required five hundred yards (Sec. 58-743, Code of 1962) before the locomotive reached Main Street crossing.

The approach to the crossing from the east was marked by a highway railroad sign and the crossing itself by an elevated crossbuck on the Bakers' right. A similar crossbuck was located across the track on the opposite side of the highway. The crossbucks, with the reflectorized words RAILROAD CROSSING, and the highway warning sign were readily visible from the intersection of U. S. Highway No. 1, at which the Bakers were required to stop.

Automatic signaling devices of a standard type in general use in this area were mounted on the crossbuck stands. Two sets of hooded red lights were mounted back to back below each crossbuck. A reflectorized sign, STOP ON RED, was mounted below these lights. A bell was mounted on top of the crossbuck west of the track. These devices were activated when the locomotive reached a bonded joint in the track 1600 feet north of the crossing. At that moment, the two sets of red lights facing the Bakers commenced to flash alternately in a wigwag signal and the bell at the crossing commenced to clang.

Despite these manifold warnings of the approach of the train, the Bakers apparently remained oblivious of it until an instant before the collision. Neither the speed of the car nor its course was altered on its approach to the crossing. According to the testimony of C. H. Blanton, the fireman on the locomotive who was called as a witness by plaintiff, the car "just rolled right on up in front of us and we hit." As the automobile drove upon the crossing, Mrs. Baker was seen to look toward the locomotive and throw up her hands. Apparently, neither she nor her son, until that moment, had taken notice of the train or of the audible and visible signals which conspicuously heralded its approach.

In the opinion in *Jacobs v. Atlantic Coast Line Railroad Company,* 226 S. C. 475, 85 S. E. (2d) 749, in which it

was held that the truck driver was guilty of contributory negligence as a matter of law in failing to observe the approach of the train, the late, lamented Chief Justice Stukes remarked: "This is an unusual railroad crossing case in that all parties agree that the statutory crossing signals were properly given."

Here, the trial judge ruled out of the case every charge that the defendant failed to give timely notice and warning of the approach of the train. We quote from the record an agreed summary of the court's ruling.

"(T)he Court ruled that the defendant sounded the statutory warning signals by sounding its whistle and ringing its bell commencing at the required distance and that the direct light and oscillating warning light were operating properly; it further ruled that the crossing was not dangerous *per se* except insofar as the point of activation for the crossing warning lights might be at an insufficient distance to afford adequate warning considering the relative speed of the train and of vehicular traffic under the ordinance of 30 miles per hour for trains and 25 miles per hour for autos; it further ruled that the four red flashing signals were operating as the car approached, having been activated when the train was slightly over 1,600 feet north of the crossing.

"The effect of the Court's ruling on appellant's motion was to deny said motion but to limit the issue of appellant's negligence to that of speed and the ancillary question of whether the crossing lights were activated at a sufficient distance to afford adequate warning."

Consistently with the foregoing ruling, able counsel for plaintiff state in their brief: "Respondent's case rests upon the excessive speed of Appellant's train and the resulting decrease in warning time to the passing public as the proximate cause of the accident."

Fireman Blanton, as plaintiff's witness, testified that he first saw the Baker automobile in the vicinity of the first of the two small buildings on the right of Main Street,

about 300 feet from the crossing; that the automobile and the locomotive were about the same distance from the crossing and both were traveling at about 30 miles per hour. He saw the automobile as it cleared each of the buildings and as it drove upon the crossing immediately in front of the locomotive. As soon as the witness realized that the car was not going to stop, he alerted the engineer who put the brakes in emergency. The locomotive stuck the small car in the middle and broke it into two parts.

There is sharp conflict in the testimony as to the point at which the train stopped after the collision, and there is expert testimony as to the relationship of such stopping distances to speed. The plaintiff contends that it is reasonably inferable from this evidence that the train was traveling at 75 miles per hour when it reached the crossing. Construing the testimony in the light most favorable to the verdict, we assume that it is sufficient to support this inference and that the jury so found.

Plaintiff also contends that by ordinance of the town of Bethune, the speed of trains was limited to 15 miles per hour and that the defendant's flagrant violation of this ordinance was evidence of recklessness and willfulness in the operation of the train. The defendant contends that there was no valid ordinance. The court ruled that the ordinance was valid but that, as amended by resolution of the town council, it imposed a speed limit of 30 miles per hour upon trains. Instead of resolving these conflicting views, we assume for the purposes of our decision that the evidence raises a jury issue as to whether the defendant was guilty of causative recklessness and willfulness in the operation of its train. This assumption eliminates the defense of contributory negligence and brings us to the controlling issue; whether Mrs. Baker or her eighteen year old son was guilty of contributory recklessness and willfulness as a matter of law.

We find it unnecessary to weigh Mrs. Baker's conduct as a passenger because, under the circumstances of this case, she was responsible for any negligence of

Winifred in the operation of her automobile. The return trip was a necessary sequel to the use of Mrs. Baker's automobile for transporting Clifton to his base at Myrtle Beach. As was to be expected under the circumstances, it had to be made during the hours of darkness. Mrs. Baker's purpose was to return herself, her minor son and her automobile to Kershaw. She had the election of driving herself or of having Winifred drive for her. She chose the latter course. The natural inference from these facts is that this eighteen year old son, in chauffeuring his mother toward home in her automobile from this family mission, was engaged in her service and was subject to her direction and control. In the absence of evidence tending to suggest a different arrangement or relationship, of which there is *none,* this is the only reasonable inference to be drawn from the evidence. Any other would of necessity rest in sheer conjecture and speculation. Therefore, any negligence or recklessness of the son in operating the automobile was imputed to his mother under principles of *respondeat superior* .

Ordinarily, "(o)n reaching a railroad crossing and before attempting to go upon the track, a traveler must use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances; he must look and listen in both directions for approaching trains, if not prevented from so doing by the fault of the railroad company, and to the extent the matter is under his control must look and listen at a place and in a manner that will make the use of his senses effective * * *." *Chisolm v. Seaboard Air Line Ry.,* 121 S. C. 394, 114 S. E. 500, 503.

The foregoing rule is not an absolute one but may be qualified by attendant circumstances. The opinion in Chisolm cites as examples of conditions which may qualify the duty and excuse the failure to look and listen, effectively, the following:

"* * * First, where looking and listening would not have availed to avert the injury; second, where the traveler enters

upon the track under an express or implied assurance of safety, as where gates are open or signals are given by watchmen; third, the presence of some imminent danger or emergency, not brought about by the traveler's own negligence; fourth, the presence and influence of unusual or extraordinary conditions, not created or controlled by the traveler himself, and especially where such conditions are brought about by the railway company, which are sufficient to distract and divert the attention of a man of ordinary prudence and self-possession from the duty of looking and listening effectively for an approaching train * * *." 114 S. E. 503.

Conversely, in the absence of circumstances reasonably tending to distract the attention or blunt the vigilance of a man of ordinary prudence and self-possession, a traveler who enters upon a conspicuously marked crossing, or one with which he is familiar, in the path of an approaching train, without the exercise of even slight care to discover the presence of so obvious and great a peril, when had he but looked or listened, he must have discovered it, is guilty of gross contributory negligence and recklessness as a matter of law. *Cable Piano Co. v. Southern Railway,* 94 S. C. 143, 77 S. E. 868; *Chisolm v. Seaboard Air Line Ry.,* 121 S. C. 394, 114 S. E. 500; *Moore v. Atlantic Coast Line R. Co.,* 192 S. C. 406, 7 S. E. (2d) 4; *Bramlett v. Southern Rwy. Co.,* 234 S. C. 283, 108 S. E. (2d) 91, (Automatic signals at crossing were operating.); *Wingate v. Seaboard Air Line Rwy. Co.,* 244 S. C. 332, 137 S. E. (2d) 258.

Resourceful counsel seek to escape the seemingly inevitable application of the rule to the facts of this case by the claim that the great speed of the train put it upon the crossing before the automatic signals had been activated for sufficient time to furnish adequate warning. If it were reasonably inferable from the evidence that the signals did not begin to flash and sound their warning until the automobile had arrived at or dangerously near the crossing, this element would have to be considered. See *Gossett*

*v. Piedmont & N. Ry. Co.,* 241 S. C. 501, 129 S. E. (2d) 326, and decisions therein cited holding that the failure of such signals to operate may be an implied assurance of safety and require the submission of the issue of contributory negligence to the jury. However, the evidence quite clearly excludes such an inference.

The signals were activated when the locomotive reached a point 1600 feet from the crossing. If its speed was 75 miles per hour, which plaintiff contends, it travelled 110 feet per second and required 14½ seconds to cover the distance from the activation point to the crossing.

The only testimony as to the speed of the automobile was the fireman's estimate that it approached the crossing at 30 miles per hour. If we assume instead that it traveled at the posted limit of 25 miles per hour, (one-third of the train's assumed speed) it covered one-third of 1600 feet, or about 533 feet after the signals were activated. Stated differently, at 25 miles per hour, the car traveled approximately 37 feet per second or 536 feet during the 14½ seconds which elapsed between the activation of the signals and the collision. It is, therefore, reasonable to infer that the signals at the crossing became activated at about the time the automobile was crossing the intersection of U. S. No. 1, or very shortly afterward.

By any process of reasoning, the signals at the crossing were in operation during the time required for the train to travel 1600 feet, and, whatever its speed within the range of the testimony, this was ample time for the driver to have heeded their clarion warning and stopped in safety.

Under the circumstances of this case, if young Baker had been in the exercise of even slight care before entering upon the crossing, he could not have failed to become aware of the peril which overtook him. The conclusion is inevitable that he failed to exercise even slight care for his own safety and for the safety of his mother and was guilty of gross negligence and recklessness as a matter of law.

Reversed and remanded for entry of judgment for the defendant.

TAYLOR, C. J., and Moss and LEWIS, JJ., concur.

BUSSEY, J., dissents.

BUSSEY, Justice (dissenting).

Being unable to agree with the conclusion that the driver's delicts were, as a matter of law, imputable to Mrs. Baker I most respectfully dissent. True, Mrs. Baker was the owner of the automobile. Being present, she had the legal right to control the same. And, the driver was her son. The presence of the owner, with the legal right of control, and the relationship of mother and son, are however, insufficient facts to create the relationship of master and servant. In this connection see *Neese v. Toms*, 196 S. C. 67, 12 S. E. (2d) 859. In order to impute any recklessness of the son to his mother, under the principles of *respondeat superior,* it is necessary that the son must have been engaged in the service of his mother and subject to her direction and control while so engaged. In this respect I think the evidence is susceptible of more than one reasonable inference.

Our consideration of this question is necessarily guided by certain elementary principles of law. All of the evidence, together with the inferences reasonably deducible therefrom, have to be viewed in the light most favorable to respondent. Contributory negligence or willfulness is an affirmative defense, the burden of proof being upon appellant. On appeal, the burden is on appellant to show not only error, but prejudice. In the light of these principles, I proceed to consider the record before us and the evidence therein contained.

The record does not contain the charge of the trial judge, and we are left in the dark as to precisely what he charged the jury with respect to imputation of negligence or willfulness. The only witnesses testifying who could throw any light on the actual relationship existing between the parties, were Mrs. Baker's husband, W. L. Baker, and her adult

son, Clifton Baker. The record does not contain the entire testimony of either, but only excerpts therefrom. The testimony of W. L. Baker throws no light on the question under consideration, and the rather meager facts we have before us bearing on the relationship of the parties is contained in an excerpt from the testimony of Clifton Baker. From his testimony, viewed in the light most favorable to respondent, the following facts appear.

Clifton Baker, an adult, was stationed at Myrtle Beach Air Force Base, and had come home for a couple of days during the holiday weekend. The automobile involved was a 1961 Chevrolet Corvair, which had orginally been purchased when new by Clifton Baker, but had been sold by him some time thereafter to his mother. Neither the date of, nor the consideration for, this sale appear in the record. Winifred Baker, while only 18 years of age and still living at home, was employed and, on the day of the tragedy, worked until about 3 o'clock P. M. Winifred was a good, experienced, cautious driver. At approximately 4 o'clock P. M., Clifton left the home of his parents in Kershaw, driving the automobile, for the purpose of returning to Myrtle Beach Air Force Base. On this trip his brother, Winifred accompanied him, sitting on the front seat beside him and Mrs. Baker also accompanied him, sitting on the rear seat of the automobile.

When the parties arrived at Myrtle Beach, Clifton released the wheel of the automobile to his brother Winifred, and Mrs. Baker then got into the front seat beside Winifred. There is nothing in the record as to any conversation which took place at that time between the parties. It was brought out that Mrs. Baker contemplated stopping to see a party in Darlington in the course of the return trip. Whether she made such stop or not, the record does not show, but it is clearly inferential that this intended stop was merely a side incident of the main purpose of the journey. I think it clear from the evidence that the principal, if not the only real purpose, of the trip was to serve the convenience and ends

of Clifton Baker, and not some business, purpose or end of Mrs. Baker.

This meager evidence is clearly susceptible of the inference I think, that Mrs. Baker simply entrusted the automobile to her son Clifton, to whom the automobile had formerly belonged, for the purpose of accomplishing his return to Myrtle Beach. And that he, having arrived at his destination, relinquished the same to his brother for the purpose of completing the mission or purpose for which the automobile had been entrusted to him, Clifton, by returning it to Kershaw. That Mrs. Baker, no doubt, desired to accommodate her adult son, enjoyed his company on the trip, and of course desired to return home, are matters which were purely incidental to the main purpose of the trip, which was to serve the ends of Clifton Baker.

If any of the testimony, adduced on the trial, threw any light upon the circumstances attendant upon the inception of Clifton's trip to Myrtle Beach, such portion of the testimony was excluded from the record on appeal. The record contains no mention of any conversation between the parties or plans for the trip. Since the journey did not commence until approximately an hour after Winifred finished work, and since Clifton drove to Myrtle Beach, where he released the wheel to Winifred for the purpose of the return trip, I think that the jury could well have reasonably inferred that Clifton made some arrangement with his mother for his use of the car, with the understanding that Winifred would go along and drive the car back. Whether, or under what circumstances, Mrs. Baker planned and intended to make the trip herself, or whether she decided to go at the last minute as an afterthought, is simply not shown by the record. Whatever plan or arrangement was entered into, the fact remains that the real purpose of the trip was to accomplish Clifton's ends.

While I know of no case in this state directly in point, I think the clear weight of authority from other jurisdictions

supports the proposition that, even in cases where the normal relationship of master and servant exists, returning an automobile to the owner following its use by the servant for his own purposes, is not a service being rendered for the owner so as to constitute the driver the servant of the owner. The fact that the owner may receive some incidental benefit from or in connection with the trip does not alter the relationship. See annotation in 51 A. L. R. (2d) commencing at page 21, particularly the cases collected in Sections 3, 4 and 6.

With the burden of proof being upon the appellant to prove contributory willfulness on the part of Mrs. Baker, by imputation or otherwise, and the further burden resting upon appellant of bringing before this court a record sufficient to show wherein the court below committed error, I do not think this court is warranted in holding that Winifred was, as a matter of law, the agent or servant of Mrs. Baker at the time. Under all of the circumstances disclosed by the record, I think a jury issue was presented.